David B. CORTRIGHT, on behalf of himself and others similarly situated, et al., Petitioners,

v.

Stanley R. RESOR, Secretary of the Army, Major General Walter M. Higgins, Commanding General of Fort Hamilton Complex, New York, Respondents.

No. 70 C 909.

United States District Court,
E. D. New York.

March 23, 1971.

Lefcourt, Garfinkle, Crain, Cohn, Sandler, Lefcourt, Kraft & Stolar, New York City, for petitioners; Frederick H. Cohn, Martin R. Stolar, New York City, of counsel.

Edward R. Neaher, U. S. Atty., E.D. N.Y., Brooklyn, N. Y., for respondents; Lloyd Baker, Asst. U. S. Atty., Captain John T. Lenga, of counsel.

## MEMORANDUM

WEINSTEIN, District Judge.

This litigation presents serious questions concerning the right of soldiers to free speech and the authority of this Court to protect that right. In the belief that the Army's ability to function effectively would be strengthened, a soldier was transferred and regulations were more strictly enforced because some members of an Army unit circulated and signed petitions opposing the war in Vietnam and because some members' wives and one member's girl friend demonstrated against that war. These steps were approved by the chain of command up to and including the Secretary of the Army.

■■ Discipline, otherwise appropriate and lawful, becomes illegal when it is utilized to suppress First Amendment rights. This Court has the power to protect the constitutional rights of members of the Armed Forces. For the reasons indicated below, that power must be exercised in this case.

## LITIGATION IN BRIEF

Specialist David Cortright, a member of the United States Armed Forces and a former member of the 26th United States Army Band at Fort Wadsworth, New York (Band), brings this class action against the Secretary of the Army and General Higgins, Commanding Officer of the Fort Hamilton Complex, New York, seeking declaratory relief and an injunction prohibiting the defendants from interfering with his First Amendment rights. He also seeks relief in the nature of mandamus cancelling the order transferring him to Fort Bliss, Texas "and forbidding future transfer of the [plaintiff and members of his class] * * * without good cause shown." He alleges that defendants infringed his First Amendment right to freedom of speech by threats and harassment, and that his transfer to an over-strength unit violated Army regulations.

A number of former members of the Band have been permitted to intervene. They seek to have their transfers to various posts cancelled on much the same grounds as Cortright.

Defendants deny that the Court has jurisdiction. They also deny that plaintiffs' rights were violated.

Voluminous records of the Army's investigation into the complaints under Article 138 of the Uniform Code of Military Justice, 10 U.S.C. § 938, have been submitted to the Court. This record has been supplemented by testimony and exhibits.

## EXPRESSIONS OF DISSENT BY PLAINTIFFS AND REACTIONS OF THEIR OFFICERS

On November 9, 1969 an advertisement signed by 38 members of the Band, among many other Armed Forces personnel, appeared in the New York *Times*. (Throughout the pertinent period there were about 55 members in the Band.) The advertisement called for the immediate withdrawal of United States forces from Vietnam and urged members of the Armed Forces to participate in a November 15, 1969 demonstration and march on Washington, D.C. to protest our involvement in Southeast Asia.

The Band's Commanding Officer, CW4 Arthur Shettle, reacted sharply to this expression of dissent. On November 11, 1969 he called a special formation of the Band and discussed the advertisement. He warned that General Higgins, Commander of the Fort Hamilton Complex which includes Fort Wadsworth, was aware of their activities and that under similar circumstances the 7th Army Symphony had been disbanded.

In the Spring of 1970 a new petition protesting the war was distributed among the members of the Band. Apparently copies were mailed to all those who had signed the earlier document. This petition created more controversy.

In April a meeting of the entire Band was held at the urging of those opposed to the petition. The meeting was held on post in the stands at the rehearsal grounds during lunch break. Reac-

tions of the Band's superiors to the signing of the petition was discussed. It was finally agreed that the petition would be published only if a majority of the Band approved. Discussions continued both on and off post, but they were part of general conversations and did not disrupt the daily routine.

By mid-June, 1970 thirty-five members of the Band had signed the new petition. At this point the new unit commander, CW3 Patrick Flores, intervened. On June 18, 1970 he called into his office Specialist Thomas Sicola, a Band member with reservations about the petition, and advised against its publication. Flores also addressed the Band and warned of possible repercussions. After discussing the matter and taking a poll, Cortright told the sponsors—a civilian group—not to publish the names of any Band members. There is some indication that during one part of these discussions "one individual * * * swung on the other."

As the Band was about to march in a July 4th parade on Staten Island, five women—Cortright's fiancee and the wives of some other Band members—attempted to join the line of march while carrying "peace" signs. Although a scuffle occurred between the women and some spectators, the Band continued to march in formation and play. This incident was reported in a Staten Island newspaper. No signs specifically connected the Band with the demonstration.

Following the July 4th incident regular rehearsals were cancelled and Flores attended meetings at the headquarters of the Fort Hamilton Complex. On July 8, 1970 significant changes were made in the duty schedule of the Band. These included lengthening of the duty day, addition of Saturday duty, and implementation of additional training. Certain privileges such as less strictly enforced haircut regulations, exemption from full police and fatigue details, exemption from Monday morning command reveille and permission to take private music lessons during duty hours were eliminated. At a Band formation, Flores explained that the changes were instituted because of the men's anti-war activities. He advised them to end such action and accept these duty changes. He warned that if they did not, further measures might be taken.

Some Band members did not take his advice to accept these changes. On July 10, 1970 a letter signed by Cortright and 35 other Band members was sent to General Higgins listing the events outlined above and asking for recision of the duty changes.

Upon receiving the letter, General Higgins instructed Colonel Merrick, Deputy Commander for the Fort Hamilton Command, to meet with the Band. On July 12 Colonel Merrick called the Band together to explain that the measures "were not punitive." He told the men that they represented normal practice, "regardless of how Mr. Flores may have represented them."

On July 17, 1970 Cortright was ordered to report to the 62nd Army Band at Fort Bliss, Texas. Instead of the usual thirty to sixty day lag between the transfer orders and the scheduled date of arrival at the new station there were seven. At Fort Bliss he was not assigned to the 62nd Army Band but was ordered to assist the Chaplain.

The 62nd Army Band—the transferee —at the time was already three men over-strength in Cortright's specialty, the baritone horn, and another man with this training was on the way. By contrast, the 26th Army Band—the transferror—with Cortright's departure, had no men in his specialty even though its table of organization called for such a specialist.

At the trial General Ciccollela, Chief of Staff of the United States First Army, testified candidly that the reason for Cortright's precipitous transfer was the desire to rid the Band of a troublemaker. He testified:

[W]hen I first came to First Army in June and got my briefing on the First Army situation, the 26th Army Band came up in the briefings, and

I got the impression that they had some elements in it that were causing problems to the commander at Fort Hamilton.

\* \* \* \* \* \*

[Cortright] came to my attention early as being the more vocal, the more active dissident in the band, the one who apparently had made himself the leader of a little gang that had organized itself in the band, was very active in their dissenting activities, and was what was considered to be a troublemaker in the band.

Q Did you form any conclusions about the effect of Specialist Cortright's activities on the band?

A Yes. It was my judgment that what he was doing in the band was weakening its general morale, it's discipline and effectiveness.

Q Did you take any action regarding Specialist Cortright regarding those reports and your conclusions?

\* \* \* \* \* \*

A I called the staff in and asked them to look into it and let me have their recommendations. And the first recommendation they made was to the effect the band had not been drawn down to their authorized strength, that there were still ten or twelve over their authorized strength.

I asked them if Cortright was eligible for transfer, and they said he was, and I told them to move him.

The Article 138 material confirms that Cortright's transfer took place as General Ciccollela requested.

There is no doubt that the Chief of Staff was acting for what he, in good faith, felt was the best interests of the Army. He testified on direct examination:

Q What did you intend to accomplish by taking that action resulting in Specialist Cortright's transfer?

A We intended to accomplish the strengthening of the band and making it a better military unit, a unit that would accomplish its mission. This is important to us in the Army.

The Chief of Staff conceded that the Band had "performed satisfactorily" in marching and playing. He was apparently primarily concerned with the ability of this Band to respond properly to "a wartime requirement, and that is to be able to fight and be able to defend vital installations and be responsive immediately to orders without question." He agreed that "any soldier, just like any other citizen, has the right to free expression, and we give it to them. We have the most democratic Army in the history of the world." But, he concluded that dissent had weakened "the effectiveness of that military unit."

On cross-examination he declared:

A These were activities like meetings and being carried away with their views, being opposed to the war and to their government, and being opposed to the nation and all that sort of stuff. All this has a deleterious effect on the morale.

Q What leads you to believe they are opposed to their government?

A When they go out and want to protest, I am not saying this is wrong, they want to carry banners protesting the war, I think that is in disagreement with their government.

Q That is not being against their government; there is a difference?

A Let me say they are in opposition.

Q On a particular issue?

A On the battlefield there can't be any opposition to anything.

References in the testimony to the failure of the Band to march in the rain on "Armistice Day," November 11, 1970, have not been considered by the Court since this event took place after the discipline. In any event, Colonel Merrick testified that the decision not to play was made as a result of a "breakdown in communication" with Mr. Flores and not as a result of any resistance by enlisted men.

Colonel Merrick admitted that the Band had always followed orders; "They were a fine playing band, and still are." He was, however, somewhat upset by the possibility that the audience might not care for the anti-Vietnam war views of Band members. He told the Court:

[M]y feeling in the matter being that the purpose of the band is to represent the Army in New York, and it plays primarily before all of these military orders, Veterans of Foreign Wars, American Legion, these types of units, and * * * it's not what we * * * would be looking for at all as an Army representation in New York.

General Higgins was, like Colonel Merrick, bothered by the petitions because they publicly revealed dissent. In a four page letter dated July 17, 1970 to his superior, General Seaman, Commanding General of the First United States Army, he wrote:

As I have mentioned in the past, my band has the potential for being a problem because of several dissident oriented types assigned to it.

On my arrival, I was informed * * * that the individual most evident in dissident activities was a SP4 David A. Cortright, a graduate of Notre Dame and the band's drum major.

* * * * * *

In November, the first outward manifestation of Specialist Cortright's activities appeared in the New York Times which was the signing by 20 members of the band of a petition in opposition to our country's stand in Vietnam. * * *

* * * * * *

I * * * directed my Deputy, Colonel Merrick, on a very close hold basis, to make contact with your headquarters and determine the possibility of moving on these known dissident oriented members of the band.

* * * * * *

Mr. Flores, on 8 July 1970, had another meeting with the band. Out of a sense of frustration and disappointment as a result of the 4 July incident, he informed the band that as a result of the incidents I have previously outlined, stricter steps would be taken in the areas of personal appearance, work schedules, work hours, and military discipline.

* * * * * *

Yesterday, this headquarters received orders transferring SP4 Cortright to Fort Bliss, Texas. This occurred after Colonel Merrick's discussion with your headquarters.

* * * * * *

I do not intend to personally reply to the letter of the band since I feel Colonel Merrick's open door discussion was an adequate reply and my IG will process the complaint in accordance with normal IG procedures. The IG responded to [the men's] complaint and concluded there was no evidence of mass punishment or retaliation consummated by Mr. Flores.

I am orally admonishing Mr. Flores for his undesirable action when he related his directed reactions to specific incidents committed by the band which gave the guard house lawyers an opportunity to try to avoid being soldiers through their recourse to the IG and UCMJ provisions.

Flores also reflected the views of his superiors that anti-Vietnam views were undesirable. In his statement to the investigating officer, Colonel Bieber, he admitted telling his men, among other things:

[i]f I was the Commanding General I would be hard put knowing that 35 members of this unit had signed an antiwar petition and sent it out to represent the U. S. Army in functions involving the V.F.W. and American Legion or any other community activity.

Colonel Bieber relied heavily upon this community relations aspect of the case. He found: "the anti-Vietnam activities

of the band members presented a clear and present danger to the community relations mission of the band." In the summary of the case prepared by Colonel Williams for the Staff Judge Advocate it was noted that the policy of the First Army was: "military bands must be 'politically neutral' if they are to be effective."

The statement of Flores made to Colonel Bieber that "discipline" was very lax is contrary to the other information in the record and is belied by the fact that although Flores assumed command in February of 1970, he took strong action only in July when the free speech issue came to a head.

Plaintiff Cortright is effectively uncontradicted in his testimony that the Band's musical performance was excellent and that the only "morale problem" was that associated with the exercise of First Amendment rights.

Cortright also testified that he was called into Flores' office and told that names of Band members should be withdrawn from the second petition. This advice, with a threat of adverse action, was repeated to the Band and as a result the names on the petition were withdrawn. The testimony of Cortright on this matter is supported by portions of the Article 138 record and is not contradicted:

Sergeant Sicola then told me—this is in June—that I was to report to Mr. Flores' office. I came down to the office, and Mr. Flores told me, "What's with this petition?"

I says, "We've signed a petition, and about forty members of the band had sent in their names to this committee."

He told me at that time, he said it was very unwise; he said that the Fort Hamilton command was watching the band, that we should be very careful of our peace activities; that although we had some rights, the Army also had rights, and that he felt that the band members should definitely withdraw their names from their signature—from this petition, because the band would then, if it was submitted—that the band would suffer the consequences.

He then told me that—this very afternoon, that he was having a formation of the band, a special band formation, and he would discuss this issue of the petition to the whole band.

I then went upstairs and the formation was called—this is an afternoon formation—Mr. Flores came up and addressed the band. He started with the whole band as he had started with myself, saying that, "I heard about this petition and I think it is very unwise." He told the members of the band that they should not go ahead with this petition, that they should withdraw their names, because the Fort Hamilton command was watching, and they would not be disposed to let this pass.

He urged us to reconsider the petition and to withdraw our names.

Shortly after that formation, before the band was dismissed for the day, Sergeant Sicola came up to me and said that he had just been told by Mr. Flores that we had to have a decision on this matter, the petition, that day or as soon as possible.

I asked him what he meant, and he said that we should take a poll or a vote of the members of the band and decide what they felt about the petition, and whether or not a majority of the members of the band wanted to have the petition withdrawn.

\* \* \* \* \* \*

At the end of this poll, I came up with a count of something like 27 against submitting the petition, 23 for.

Since the will of the band had previously been expressed that we would abide by whatever the majority felt, those of us who were in charge of the petition then told Sergeant Sicola that the petition would be withdrawn.

Cortright's Article 138 statements and testimony at the trial are confirmed by

the Article 138 statements of Specialist Thomas Sicola. This soldier, who was a long time member of the Band, opposed the signing of petitions and any other anti-Vietnam activities. He described his background as follows:

> I am not involved in the signing of the petition or complaint. Possibly because of my age and length of time in service and the fact that I probably have more to lose than anyone, the fellows listen to me. They know I have a wife and a house that I am trying to keep and I will not act hastily or foolishly. I have a good relationship with the CO and the first Sergeant. I have in the past been able to communicate with both sides. I tried to smooth over the petition and the July 4th incident. I was not successful. I discussed the problem with Mr. Flores and Spec. Cortright who was the leader of the petition signing. Spec. Cortright did not hide nor deny this fact. He felt he was in the right and it was legal.

Sicola's description of the discussion by Colonel Merrick is particularly revealing:

> I was present at a formation on Monday, 13 July 1970 when Col. Merrick discussed with all members of the band the ten points which were listed in a letter to General Higgins and signed by 35 band members. They are the same ten points that were in Spec. Cortright's complaint. My reaction to Col. Merrick's explanation was simply total unacceptance. They were not explained adequately or realistically. We were expecting that type of explanation but we did not feel that they were honest or truthful. We were asked by Col. Merrick if there were any questions. A question was asked by Spec. Cortright. No other questions were asked as it seemed impossible to get an honest answer. At that point discretion seemed the better part of valor.

Sicola also confirmed that the Band had at all times conducted itself in a military manner.

## ARTICLE 138 PROCEEDING

On July 22, 1970 on behalf of the Band a proceeding was begun under Article 138 of the Uniform Code of Military Justice, 10 U.S.C. § 938, to obtain a review of grievances. (The action in this Court was commenced on July 23, 1970.) Article 138 reads as follows:

### Complaints of wrongs

Any member of the armed forces who believes himself wronged by his commanding officer, and who, upon due application to that commanding officer, is refused redress, may complain to any superior commissioned officer, who shall forward the complaint to the officer exercising general court martial jurisdiction over the officer against whom it is made. The officer exercising general court-martial jurisdiction shall examine into the complaint and take proper measures for redressing the wrong complained of; and he shall, as soon as possible, send to the Secretary concerned a true statement of that complaint, with the proceedings had thereon.

The Article 138 investigation is relatively new and, as yet, little used. Although procedures for investigating officers have been promulgated, they were not followed in this case; the Army's position is, apparently, that they are suggested and not mandatory. See AR 15–6.

In this instance, procedure was quite informal and involved only minimal participation by Cortright. Colonel Russell Bieber was appointed by General Ciccollela to investigate the matter. Although he interviewed many of the individuals involved, he did not attempt to speak to the complainant Cortright. (This failure seems to have been in direct conflict with AR 15–6, ¶ 8.) Nor did he wait for Cortright's response to a letter of inquiry before making an initial report. On September 1, 1970 Colonel Bieber found:

> That the changes in duty assignments made by the Commanding Offi-

cer, 26th Army Band, Fort Wadsworth, and announced at a formation of members of that unit on 8 July 1970, were made for the purpose of improving the military efficiency of the unit, and that such changes were in the best interest of the unit and the United States Army.

He recommended:

That the complainant be advised that there is no basis in fact for allegations set forth in his letter of complaint dated 22 July 1970 submitted under Article 138, UCMJ.

In October the file was returned to the Commanding General of the First Army by the Judge Advocate General "for further investigation." The thrust of the review was to determine whether Cortright had overstepped the bounds of propriety in his activities. Colonel Bieber was told to question all current members of the Band and readily available former members about the following specified matters:

a. Did you ever attend or are you aware of any meetings called by SP4 Cortright alone, or with others, on post during duty hours, or after duty hours in the spring of 1970 during which he and/or others sought signatures for a petition to be published in the New York Times? If so, describe in detail the time, date, and the circumstances of each such meeting.

b. Were career soldiers barred from any such meetings? If so, describe in detail.

c. Did Cortright alone, or with others, solicit signatures on post during duty hours, or after duty hours, for the petition? If so, describe the time, date, and circumstances in each instance.

d. Did Cortright ever disparage his military leaders or military policies, counsel others to resist orders or attempt to hinder, impair, or oppose the mission of the Band, the Command, or the Army, in any way? If so, describe the time, date, and circumstances of each instance.

e. If knowledgeable members of the Band refuse to make a statement, this should be documented.

The directive continued:

3. In addition, the investigation should determine whether there was a post policy prohibiting petitions or meetings in post buildings at Fort Wadsworth without permission? If so, attach a copy.

4. Did Cortright attempt to hinder the restoration of discipline within the Band? If so, document fully.

Recorded statements accompanying the materials of the Article 138 Proceeding demonstrate that Colonel Bieber followed that list quite strictly. As each of the witnesses were questioned, they were warned not to discuss their testimony with anyone, including any civilian attorney, even though in some instances the person interviewed was represented by an attorney in the case before this Court. (This instruction seems to have been in direct contradiction of AR 15–6, ¶¶ 8, 14.)

On November 9, 1970, after further investigation, Colonel Bieber adhered to his original findings and recommendations. These findings were reviewed and upheld by General Seaman of the First Army and the Secretary of the Army. There are, we are informed, no other administrative remedies available to plaintiffs.

### THE INTERVENORS

The five intervenors are members of the Band who received transfer orders to Korea and Vietnam in July, August and September of 1970. These transfers were effectuated by the General Support Branch, Replacement Division, Enlisted Personnel Directorate, Office of Personnel Operation, and were based on requests from field commanders for personnel according to Military Occupational Specialty. Most of the operation is computerized. The match between request and eligible individual is made by the computer from the Enlisted Master Tape Record. If the computer cannot,

within given tolerances, match the need with an eligible individual it is done by clerks.

Since none of the intervenors had ever served overseas, they were among the most eligible for such assignment. The Chief of the Branch which effected these transfers and all the clerks who may have hand-matched the transfers swore in affidavits that they did not recognize any of the intervenors' names and had not received any extraordinary communications regarding them. The overseas bands to which the intervenors were assigned were below authorized Band strength. These transfers were apparently attributable solely to a desire to reduce the 26th Army Band to its authorized strength.

## DEFINITION OF CLASS

It is appropriate that plaintiff sue on behalf of himself and other members of the Band with respect to the issue of whether their freedom of speech was inhibited by threats, harassment or punitive changes in duty assignment. At an earlier stage of the litigation, the Court ruled against an attempt to expand the class of plaintiffs to include the entire Army or even all soldiers in the Fort Hamilton Complex. There has been no showing that the dispute involves persons outside the Band and their superior officers.

Defendants contest the propriety of a class action on only two grounds. They maintain that the class is not so numerous that joinder of all members is impracticable, Fed.R.Civ.P. 23(a) (1), and that the representative parties will not fairly and adequately protect the interests of the class, Fed.R.Civ.P. 23(a) (4).

The requirement that the class be numerous is flexible; a large range of discretion is left to the district judge. Fed.R.Civ.P. 23(a) (1). *See* In re Engelhard & Sons Co., 231 U.S. 646, 34 S. Ct. 258, 58 L.Ed. 416 (1914); Cypress v. Newport News General & Nonsectarian Hosp. Ass'n, 375 F.2d 648, 653

(4th Cir. 1967); 3B Moore, Federal Practice ¶ 23.05 at 23–280 (2d ed. 1969). At the time this suit was commenced there were 56 Band members. Class actions have been allowed to proceed with considerably fewer in the class. *See, e. g.,* Cypress v. Newport News General & Nonsectarian Hosp. Ass'n (18 members), *supra*; Fidelis Corp. v. Litton Indus., Inc., 293 F.Supp. 164 (S.D. N.Y.1968) (35 to 70 members); Philadelphia Elec. Co. v. Anaconda American Brass Co., 43 F.R.D. 452, 463 (E.D. Pa.1968) (25 members).

This litigation calls for expeditious resolution, particularly because it involves the United States Army. If all of the interested members of the Band were to intervene, the action might be unnecessarily protracted and cluttered. The Army itself seemed to recognize this in the proceeding under Article 138 since it treated one complaint as representative of the complaints of the other members of the Band.

Defendants also argue that the representative parties cannot fairly and adequately protect the interests of the class. Their claim is that the propriety of Specialist Cortright's and other members' actions is widely debated within the Band and that some Band members strenuously object to the actions. One difficulty with defendants' position is they have not demonstrated the truth of their allegations. The class is small and it must be common knowledge among members that this litigation is in progress. *Cf.* Snyder v. Board of Trustees of U. of Ill., 286 F. Supp. 927, 931, 937 (N.D.Ill.1968) ("notice requirements of Rule 23 are satisfied simply by the widespread notoriety this case has been given"). Yet, none of the Band members has objected to the proceedings or asked to be excluded from the litigation.

■ There is no antagonistic interest here in the sense of Giordano v. Radio Corporation of America, 183 F.2d 558 (3d Cir. 1950). In that case one group within the proposed class desired to retain the dismissed officers of the union

involved and another desired to have them expelled. In this case the representative parties seek to establish freedom of all members of the Band to exercise their First Amendment rights. Whether all the members desire to exercise these rights is not relevant to the issues in the litigation. The possibility that some might not, at this time, wish to exercise their right to freedom of speech does not preclude a class action. *Cf.* Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920, 937 (2d Cir. 1968); Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 562–563 (2d Cir. 1968); Rosado v. Wyman, 322 F.Supp. 1173, 1194, (E.D.N.Y.) aff'd, 437 F.2d 619 (2d Cir. 1970); Dawson v. Delaney, 189 F.Supp. 416, 419 (D.Del.1960).

The issue of punitive transfers stands on a different footing from the measures taken against the Band as a unit. Each of the transfers must be judged separately, bearing in mind the particular qualification of the soldier being transferred and other circumstances peculiar to the transfer. Furthermore, only six individuals, including Cortright, have been transferred and desire to participate in this litigation.

■ An action may be maintained, when appropriate, as a class action with respect to particular issues. Fed.R.Civ. P. 23(c) (4) (A). Those portions of the complaint dealing with threats to the entire Band are best treated as a class action. The transfer issue can best be handled by intervention.

### POWER OF THE COURT UNDER SECTION 1331

Plaintiffs assert and defendants deny that sections 1331, 1343, 1361, 2201 and, apparently, 2241 of title 28 and sections 1981 and 1983 of title 42 provide a basis for exercise of our jurisdiction. As demonstrated below, this Court has jurisdiction under both sections 1331 and 1361 of title 28 of the United States Code.

Section 1331 grants original jurisdiction to the federal courts over matters arising "under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331(a). It requires that the "matter in controversy exceeds the sum or value of $10,000, exclusive of interests and costs." *Id.* Defendants argue that no plaintiff can demonstrate that the amount in controversy exceeds $10,000, for none was reduced in pay grade nor did any suffer monetary damage.

■ Dismissal for lack of jurisdiction is inappropriate unless it appears to a legal certainty that less than $10,000 is at issue. St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 289, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938); City of Boulder v. Snyder, 396 F.2d 853, 856 (10th Cir. 1968), cert. denied, 393 U.S. 1051, 89 S.Ct. 692, 21 L.Ed.2d 693 (1969); Murray v. Vaughn, 300 F.Supp. 688, 694 (D.R.I.1969). A plaintiff's injury is not limited to such immediate economic injury as loss of pay. *See* Berk v. Laird, 429 F.2d 302, 306 (2d Cir. 1970); Gobitis v. Minersville School Dist., 24 F.Supp. 271, 275 (E.D.Pa.1938), aff'd, 108 F.2d 683 (3d Cir. 1939), rev'd on other grounds, 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375 (1940); Note, Draft Reclassification for Political Demonstrations—Jurisdictional Amount in Suits Against Federal Officers, 53 Cornell L. Rev. 916, 922 (1968).

As a result of his transfer, Cortright was moved a considerable distance from his home and family. Home visits would be more expensive. The precipitous transfer placed an added financial burden on his impending marriage. With respect to the intervenors, the expense and difficulty in communicating with family and friends is even greater, for they have been transferred to Asia.

There is a second reason why the defendants' position cannot be accepted. Plaintiffs are alleging violation of one of the most cherished constitutional rights—freedom of speech. There is an increasing reluctance to dispose of such federal constitutional issues on jurisdictional grounds.

In recent cases the Supreme Court has tended to ignore lack of 1331 jurisdic-

tional amount as a basis for dismissal. *See* Breen v. Selective Serv. Local Bd. No. 16, 396 U.S. 460, 90 S.Ct. 661, 24 L. Ed.2d 653 (1970), rev'g 406 F.2d 636 (2d Cir. 1969), aff'g 284 F.Supp. 749 (D.Conn.1968) and Oestereich v. Selective Serv. Sys. Local Bd. No. 11, 393 U.S. 233, 239, 89 S.Ct. 414, 417, 21 L.Ed. 2d 402, rev'g 390 F.2d 100 (10th Cir.), aff'g per curiam 280 F.Supp. 78 (D.Wyo. 1968). In Phillips v. Rockefeller, 435 F. 2d 976, 979 (2d Cir. 1970), a case involving the election of United States Senators where jurisdiction was in part based upon section 1331 (*id.* at 977, n. 2), the Second Circuit reached the merits, although the district court had dismissed for lack of subject matter jurisdiction—including failure of the controversy to exceed $10,000. *Id.* at 978, n. 5. *See also* Fein v. Selective Serv. Sys. Local Bd. No. 7, 430 F.2d 376, 380 (2d Cir. 1970) (Lumbard, C. J., dissenting).

The allegation of an amount in controversy in excess of the $10,000 limitation, so far as it applies to grave constitutional deprivations such as deliberate withdrawal of the right to speak by a federal official has taken on an almost formal and incontestable status. It is comparable to such jurisdictional devices developed by the English courts as the incontrovertible Bill of Middlesex or the fictitious writ of trespass, *quare clausum fregit. See, e. g.,* Goebel, Cases and Materials on the Development of Legal Institutions 118 (1946).

Commentators have criticized the requirement of $10,000 in cases such as this. *See, e. g.,* ALI, Study of the Division of Jurisdiction Between State and Federal Courts 24, 172–176 (1969); Wright, Law of Federal Courts 108–110 (2d ed. 1970); Friedenthal, New Limitations on Federal Jurisdiction, 11 Stan. L.Rev. 213, 216–218 (1959); Wechsler, Federal Jurisdiction and the Revision of the Judicial Code, 13 Law & Contemp. Prob. 216, 225–226 (1948); Note, Draft Reclassification for Political Demonstrations—Jurisdictional Amount in Suits Against Federal Officers, 53 Cornell L. Rev. 916 (1968). And the constitutional-

ity of the amount in controversy requirement has been questioned in cases where the plaintiffs allege violation of constitutional rights. *See* Murray v. Vaughn, 300 F.Supp. 688, 695–696 (D.R.I.1969); West End Neighborhood Corp. v. Stans, 312 F.Supp. 1066, 1067–1068 (D.D.C. 1970); Faulkner v. Clifford, 289 F.Supp. 895, 899–901 (E.D.N.Y.1968); Boyd v. Clark, 287 F.Supp. 561, 567–569 (S.D. N.Y.1968) (Edelstein, J., dissenting); *but cf.* Oestereich v. Selective Serv. Sys. Local Bd. No. 11, 393 U.S. 233, 239, 89 S.Ct. 414, 417, 21 L.Ed.2d 402 (1968); Wolff v. Selective Serv. Local Bd. No. 16, 372 F.2d 817, 826 (2d Cir. 1967); Goldsmith v. Sutherland, 426 F.2d 1395 (6th Cir. 1970); Boyd v. Clark, 287 F. Supp. 561 (S.D.N.Y.1968) (alternative ground), aff'd, 393 U.S. 316, 89 S.Ct. 553, 21 L.Ed.2d 511 (1969) (without reaching the jurisdictional question under 28 U.S. C. § 1331). See the noted dialogue on the power of Congress to limit the jurisdiction of the federal courts in Hart and Wechsler, The Federal Courts and the Federal System, 312 ff, particularly at 336 (1953).

The authority for an Article III *nisi prius* court to find its jurisdiction in the Constitution as well as in statutes rests in the self-executing nature of the prohibitions in the Bill of Rights. *Cf.* Jacobs v. United States, 290 U.S. 13, 54 S.Ct. 26, 78 L.Ed. 142 (1933); Bivens v. Six Unknown Named Agents, 409 F.2d 718, 723 (2d Cir. 1969), cert. granted, 399 U.S. 905, 90 S.Ct. 2203, 26 L.Ed.2d 559. No legislation is needed to give these constitutional provisions full substantive effect. *Cf.* Bivens v. Six Unknown Named Agents, *supra.* Since a substantive right is a near nullity unless there is a forum and procedure for its vindication, there is implicit power in our courts to adjudicate cases "arising under this Constitution." United States Constitution, Article III, Section 2. Theoretically Congress could have left enforcement in the first instance to the state courts with the exception of the original jurisdiction granted the Supreme Court by the Constitu-

tion. *Cf.* Wisconsin v. Constantineau, 400 U.S. 433, 437, 438, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). But, whatever the theoretical possibilities, Congress has created a full federal judicial system and its authority to abolish jurisdiction of that existing system over constitutional matters may well be circumscribed. Its power to limit jurisdiction over Congressionally adopted "Laws of the United States" may be greater because in adopting a rule of substantive law Congress may provide appropriate practical limitations, narrowing the law's effective impact. Compare the narrowly drawn limitations in the area of habeas corpus. 28 U.S.C. § 2254. As this Circuit has pointed out:

"[Congress] must not so exercise that power [to restrict the jurisdiction of the courts] as to deprive any person of life, liberty, or property without due process of law * * *." Battaglia v. General Motors Corp., 169 F.2d 254, 257 (2d Cir.), cert. denied, 335 U.S. 887, 69 S.Ct. 236, 93 L.Ed. 425 (1948).

*See also* Gonzalez v. Freeman, 118 U.S. App.D.C. 180, 334 F.2d 570, 575 (1964) (Burger, J.).

A monetary price can hardly be placed on the rights guaranteed by the First Amendment. To say that these priceless rights so many have fought and died to protect are worth nothing is to insult the basic principles upon which this nation was founded and which still give it its unique vitality. Free speech is almost by definition, worth more than $10,000, so that the allegation of jurisdiction based upon 1331 ought not be subject to denial. The right of free speech is an absolute requisite in our free and democratic society, and its "inherent 'value' must be equal to any amount set for jurisdictional purposes." West End Neighborhood Corp. v. Stans, 312 F.Supp. 1066, 1068 (D.C.C.1970). As Judge Edelstein put the matter in his dissent in Boyd v. Clark, 287 F.Supp. 561 (S.D.N.Y.1968):

This is not the nineteenth century where property rights were valued over human rights. If a man can sue in federal court on the allegation that the government is injuring his property, he certainly must be allowed to sue on the allegation that the government is oppressing him personally. Although it might be said that human rights are incapable of valuation and hence valueless, it is better to view them as incapable of valuation but only because they are of infinite value. The latter view is, in my humble opinion, the only view compatible with the commitment of our nation to a belief in the dignity of man and the inherent worth of a free individual in a free society. *Id.* at 568.

Particularly in the case of claims by soldiers against acts of their superior officers any other approach to jurisdiction would verge on the absurd. It is doubtful that the state courts have the power to grant the kind of relief against federal officials sought in this case. *See, e. g.,* Armand Schmoll, Inc. v. Federal Reserve Bank, 286 N.Y. 503, 37 N.E.2d 225 (1941), cert. denied, 315 U.S. 818, 62 S.Ct. 905, 86 L.Ed. 1215 (1942); Wasservogel v. Meyerowitz, 300 N.Y. 125, 89 N.E.2d 712 (1949); Arnold, The Power of State Courts to Enjoin Federal Officers, 73 Yale L.J. 1385 (1964). *See* Comment, Draft Reclassification for Political Demonstrations—Jurisdictional Amounts in Suits Against Federal Officers, 53 Cornell L.Rev. 916, 926 (1968). *See also* 1 Moore, Federal Practice ¶ 0.6(5) at pp. 243–248 (2d ed. 1964). This doubt has its roots in cases where state courts attempted to release soldiers from service in the federal Armed Forces—precedents particularly relevant to the instant case. *See, e. g.,* Tarble's Case, 80 U.S. (13 Wall.) 397, 20 L.Ed. 597 (1871); Arnold, *supra* at 1389–1391 (1964).

Even if the action were commenced in the state court, the defendants would have the absolute power to remove. 28 U.S.C.A. § 1442a. Upon removal, the district court is required to "proceed as if the cause had been originally com-

menced therein and [the district court] shall have full power to hear and determine the cause." If this provision makes the cause subject to any jurisdictional defects that might have been raised had the action been first commenced in the federal court, then the possibility of an action in the state court is a delusion. If, however, it is not subject to such limitations, then it is verging on the absurd to give the defendants power to confer or deny subject matter jurisdiction by their decision on removal.

If the state courts have jurisdiction and if there were no decision by defendants to remove, the state courts would be forced to adjudicate claims involving the most delicate question of federal constitutional law. Whatever mischief is to be expected from interference by federal courts in military matters would be many times compounded by litigations in fifty state court systems.

■ ■ Developments in federal jurisdiction involving state action under section 1343 of title 28 and section 1983 of title 42 gives rise to a striking anomaly if there is no jurisdiction under section 1331 of title 28. Complaints alleging violation of the right to free speech under color of state law are within the jurisdiction of the federal courts regardless of the amount in controversy. *See* Hague v. C. I. O., 307 U.S. 496, 519, 59 S.Ct. 954, 966, 83 L.Ed. 1423 (1969) (Stone, J., concurring). A right of "personal liberty, not dependent for its existence upon the infringement of property rights" will be protected against state officials. Eisen v. Eastman, 421 F.2d 560, 564 (2d Cir. 1969); *see also* National Land & Inv. Co. v. Specter, 428 F.2d 91, 99 (3d Cir. 1970). It is undisputed that freedom of speech is one of these rights.

Were the $10,000 limitation to be seriously applied, it would be easier to gain access to the federal courts when alleging a violation of federal rights by state authorities than when alleging violation of the same rights by federal authorities. If in the case before us, for example, the plaintiff were a member of the National Guard, no amount in controversy would be required; since, however, he is a member of the United States Army itself, it is suggested that he is required to demonstrate that over $10,000 is in controversy.

Phillips v. Rockefeller, 435 F.2d 976, 978, n. 5 (2d Cir. 1970), where the Court of Appeals refused to consider the District Court's finding that federal rather than state action was involved so that 1343–1983 jurisdiction would not lie, is indicative of a tendency to equate state and federal action in violation of constitutional rights for jurisdictional purposes. The court in *Phillips* decided the case on its merits—a power that it lacked if in fact there had been no jurisdiction.

■ In sum, this Court has general jurisdiction to adjudicate this claim. The Constitution, section 1331 and good sense support its power.

*Power of the Court Under Section 1361*

The plaintiff and intervenors seek a writ of mandamus cancelling their transfer orders, ordering their return to Fort Wadsworth and forbidding future transfer of them or members of their class "without good cause shown." Defendants argue that no mandamus jurisdiction exists because the actions sought to be reviewed, namely the transfer of plaintiff and the intervenors, are "discretionary" and the federal courts have no jurisdiction to mandamus discretionary acts.

Federal district courts now have statutory jurisdiction to grant mandatory relief against federal officers. 28 U.S.C. § 1361; 3 Davis, Administrative Law Treatise § 23.09 (Supp.1965) (the provision had a jurisdictional aspect, 28 U.S.C. § 1361, and a venue aspect, 28 U.S.C. § 1391); ALI, Study of the Division of Jurisdiction Between State and Federal Courts 269 (1969) (venue changes in section 1391(e) of title 28 have had more of an impact than section 1361). The jurisdictional amount limitations do not apply to section 1361. *See, e. g.,* Wright, Law of Federal Courts 108 (2d ed. 1970);

Byse, Proposed Reforms in Federal "Nonstatutory" Judicial Review: Sovereign Immunity, Indispensable Parties, Mandamus, 75 Harv.L.Rev. 1479, 1516–1517 (1962). But the statute did not expand the kinds of cases where mandamus provides an appropriate remedy. Switzerland Co. v. Udall, 225 F.Supp. 812 (W.D.N.C.), aff'd, 337 F.2d 56 (4th Cir. 1964), cert. denied, 380 U.S. 914, 85 S. Ct. 900, 13 L.Ed.2d 80 (1965); 3 Davis, Administrative Law Treatise § 23.09 (Supp.1965). *Cf.* Hammond v. Hull, 76 U.S.App.D.C. 301, 131 F.2d 23, 25 (1942); Hart and Wechsler, The Federal Courts and the Federal System 1181 (1953).

It is generally accepted that mandamus is not appropriate where there is no mandatory duty imposed on the defendant—that is, where the acts are within the ambit of administrative discretion. United States ex rel. McLennan v. Wilbur, 283 U.S. 414, 420, 51 S.Ct. 502, 75 L.Ed. 1148 (1931); Work v. United States ex rel. Rives, 267 U.S. 175, 177, 45 S.Ct. 252, 69 L.Ed. 561 (1925); Decatur v. Paulding, 39 U.S. (14 Pet.) 497, 514–517, 10 L.Ed. 559 (1840); Mollohan v. Gray, 413 F.2d 349, 352 (9th Cir. 1969). *But see* 3 Davis, Administrative Law Treatise § 23.11, pp. 355–360 (1958). It is equally well established that mandamus may be used to correct abuse of discretion by a federal officer, particularly if the abuse constitutes a violation of constitutional rights. Kauffman v. Secretary of the Air Force, 135 U.S.App.D.C. 1, 415 F.2d 991, 994 (1969), cert. denied, 396 U.S. 1013, 90 S.Ct. 572, 24 L.Ed.2d 505 (1970); Smith v. Resor, 406 F.2d 141, 146–147 (2d Cir. 1969); Ashe v. McNamara, 355 F.2d 277, 282 (1st Cir. 1965); Murray v. Vaughn, 300 F.Supp. 688, 696–697 (D.R.I.1969); Jaffe, Judicial Control of Administrative Action, 181–182 (1965); Byse & Fiocca, Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action, 81 Harv. L.Rev. 308, 349–353 (1967).

The instant action has at its heart allegations that military officers acted so as to violate Cortright's constitutional rights and the constitutional rights of members of his class. If these allegations have merit, the military officers acted outside the scope of their discretionary authority. In light of these allegations, section 1361 provides a basis for jurisdiction.

We need not consider whether the Court's power to take evidence is more limited when granting the extraordinary remedy of mandamus than it is when common law and equitable remedies are appropriate. Our conclusions on the facts would be the same even if we considered only the record of the Article 138 Proceeding certified by the Army. See the discussion of scope of review, *infra.*

*Power of the Court Under Section 2241*

In their final brief plaintiffs argue that they are entitled to be discharged from the Army because no other relief would be appropriate. Such a remedy suggests habeas corpus as a predicate for jurisdiction. 28 U.S.C. § 2241. See Note, Dissenting Serviceman and the First Amendment, 58 Geo.L.J. 534, 554–55 (1970). No case or regulation has been brought to the Court's attention suggesting that substantive or remedial law warrants termination of a soldier's obligation to serve when his right to speak is being violated. Only as a last resort should courts consider creating such a draconian rule of law. In view of the more reasonable predicates for jurisdiction in sections 1331 and 1361 of title 28, there is no reason or need to consider claims under section 2241. *Cf.* Orloff v. Willoughby, 345 U.S. 83, 93, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953).

### SOVEREIGN IMMUNITY

Defendants argue that the suit is barred by the doctrine of sovereign immunity. As in other aspects of this litigation, the legal principles which define the boundaries of this doctrine are far from clear. There is language in the cases suggesting that immunity bars

a suit which will interfere with the public administration, affect the public treasury, or cause the United States to do, or refrain from doing, some act. Dugan v. Rank, 372 U.S. 609, 620, 83 S.Ct. 999, 1086, 10 L.Ed.2d 15 (1963). A law suit brought against a public official in his official capacity is treated as if it were brought directly against the government. *See* Hawaii v. Gordon, 373 U.S. 57, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963); Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 688–690, 69 S.Ct. 1457, 1460–1461, 93 L.Ed. 1628 (1949).

■ Nevertheless, there are many instances when public officials may be sued. As conceded by defendants, sovereign immunity is not a bar if the public official is acting in excess of his authority, or his authority is unconstitutional or is being exercised in an unconstitutional manner. *See* Dugan v. Rank, 372 U.S. 609, 621–622, 83 S.Ct. 999, 1007, 10 L.Ed.2d 15 (1963); Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 701–702, 69 S.Ct. 1457, 1467, 93 L.Ed. 1628 (1949); Berk v. Laird, 429 F.2d 302, 306 (2d Cir. 1970); Schatten v. United States, 419 F.2d 187, 191–192 (6th Cir. 1969); 3 Davis, Administrative Law Treatise § 27.01, p. 146 (Supp.1965); Hart and Wechsler, The Federal Courts and the Federal System 317 (1953); Byse, Proposed Reforms in Federal "Nonstatutory" Judicial Review: Sovereign Immunity, Indispensible Parties, Mandamus, 75 Harv.L.Rev. 1479 (1962); Jaffe, Suits Against Governments and Officers: Sovereign Immunity, 77 Harv.L. Rev. 1, 34–39 (1963). This is true regardless of whether the plaintiff is seeking to enjoin an action of the public official, Berk v. Laird, *supra,* or seeking to compel the public official to act, Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959). As noted by Chief Judge Lumbard in Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 409 F.2d 718, 723 (2d Cir. 1969), cert. granted. 399 U.S. 905, 90 S.Ct. 2203, 26 L.Ed.2d 559, a

necessary corollary to judicial review is the power to enjoin the enforcement of an unconstitutional act:

The power to declare an action of the legislative or executive branch unconstitutional is an empty one if the judiciary lacks a remedy to stop or prevent the action. Few more unseemly sights for a democratic country operating under a system of limited governmental power can be imagined than the specter of its courts standing powerless to prevent a clear transgression by the government of a constitutional right of a person with standing to assert it.

*See also,* e. g., Faulkner v. Clifford, 289 F.Supp. 895, 899, n. 1 (E.D.N.Y.1968). As Hart and Wechsler put it, "no democratic government can be immune to the claims of justice and legal right." Federal Courts and the Federal System 317 (1953); *see also id.* at 1175–1177.

■ If plaintiffs are correct, defendants acted in violation of the Army's own regulations in transferring Cortright to Fort Bliss, Texas. Furthermore, they violated the Band's First Amendment rights to freedom of speech. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) once again made it clear that no government official, however high his position, may with impunity violate the Constitution. This action cannot be barred by the doctrine of sovereign immunity.

## REVIEWABILITY OF MILITARY ADMINISTRATIVE DETERMINATIONS

In a final challenge to this Court's power, defendants assert that as a matter of judicial policy the federal civilian courts may not review the actions of the military, especially where they are administrative in nature and involve matters of internal discipline. This contention, too, must fail.

It is true that courts have traditionally been reluctant to review administrative actions affecting members of the

Armed Forces. *See* Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953); United States ex rel. Creary v. Weeks, 259 U.S. 336, 42 S.Ct. 509, 66 L.Ed. 973 (1922); United States ex rel. French v. Weeks, 259 U.S. 326, 42 S.Ct. 505, 66 L.Ed. 965 (1922); Reaves v. Ainsworth, 219 U.S. 269, 31 S.Ct. 230, 55 L.Ed. 225 (1911); Arnheiter v. Chafee, 435 F.2d 691 (9th Cir. 1970); United States ex rel. Schonbrun v. Commanding Officer, 403 F.2d 371 (2d Cir. 1968), cert. denied, 394 U.S. 929, 89 S.Ct. 1195, 227 L.Ed.2d 460 (1969); Noyd v. McNamara, 378 F.2d 538 (10th Cir.), cert. denied, 389 U.S. 1022, 88 S.Ct. 593, 19 L.Ed.2d 667 (1967); Switkes v. Laird, 316 F.Supp. 358 (S.D.N.Y.1970); Jones, Jurisdiction of the Federal Courts to Review the Character of Military Administrative Discharges, 57 Colum.L.Rev. 917, 941–951 (1957); Comment, God, The Army, and Judicial Review: The In-Service Conscientious Objector, 56 Calif. L.Rev. 379, 413–425 (1968); Note, Dissenting Servicemen and the First Amendment, 58 Geo.L.J. 534, 562–66 (1970).

Originally, nonintervention in military matters was merely an aspect of the broader doctrine that forbade review of all actions by the Executive. This doctrine was based largely on the belief that the Executive, as a separate branch of government, should not be reviewed by a co-equal. *See, e. g.,* United States v. Eliason, 41 U.S. (16 Pet.) 291, 10 L.Ed. 968 (1842); Decatur v. Paulding, 39 U.S. (14 Pet.) 497, 10 L.Ed. 559 (1840). At the turn of the century the reasons for abstention from review began to seem less compelling and the federal courts started to review executive action. *See, e. g.,* Bates & Guild Co. v. Payne, 194 U.S. 106, 24 S.Ct. 595, 48 L.Ed. 894 (1904); American School of Magnetic Healing v. McAnnulty, 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90 (1902); 4 Davis, Administrative Law Treatise §§ 28.04–05 (1958). *See also* Dismuke v. United States, 297 U.S. 167, 56 S.Ct. 400, 80 L.Ed. 561 (1936). Demise of the complete refusal to review claims of Executive irregularity did not automatically induce a willingness to intervene in controversies involving military conduct. *See, e. g.,* United States ex rel. Creary v. Weeks, 259 U.S. 336, 42 S.Ct. 509, 66 L.Ed. 973 (1922); United States ex rel. French v. Weeks, 259 U.S. 326, 42 S.Ct. 505, 66 L. Ed. 965 (1922); Reaves v. Ainsworth, 219 U.S. 296, 31 S.Ct. 230, 55 L.Ed. 225 (1911).

The peculiarities of the military provided a new rationale for the doctrine of nonintervention in military matters. First, it was argued, the federal courts should not delve into military law because it is an entirely separate jurisprudence. "To those in the military or Naval service of the United States the military law is due process." Reaves v. Ainsworth, 219 U.S. 296, 304, 31 S.Ct. 230, 233 (1911).

Second, the civilian courts reasoned that the need for strict discipline and expeditious action in the military made it undesirable for courts to provide a source of protracted debate over military actions. *See* Hammond v. Lenfest, 398 F.2d 705, 710 (2d Cir. 1968).

Third, it was suggested that the uniqueness of the military meant that the civilian courts were ill equipped to deal with military problems. As the Supreme Court indicated in United States ex rel. Creary v. Weeks:

> The power given to Congress by the Constitution to raise and equip armies and to make regulations for the government of the land and naval forces of the country * * * is as plenary and specific as that given for the organization and conduct of civil affairs; military tribunals are as necessary to secure subordination and discipline in the army as courts are to maintain law and order in civil life; and the experience of our government for now more than a century and a quarter, and of the English government for a century more, proves that a much more expeditious procedure is necessary in military than is thought tolerable in civil affairs. * * * 259 U.S. 336, 343, 42 S.Ct. 509, 510 (1922).

This explanation for the hesitancy of the civilian courts to review military matters was pointed to by Former Chief Justice Warren:

[I]t is indisputable that the tradition of our country, from the time of the Revolution until now, has supported the military establishment's broad power to deal with its own personnel. The most obvious reason is that courts are ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have. Many of the problems of the military society are, in a sense, alien to the problems with which the judiciary is trained to deal. Warren, The Bill of Rights and the Military, 37 N.Y.U.L.Rev. 181, 187 (1962).

The peak of this reluctance to intervene—as well as the beginning of a decline—is marked by Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953). It involved legislation enacted during the Korean War to alleviate the acute shortage of medical personnel. Orloff, a psychiatrist, claimed that the Army had drafted him under the authority of the Act but refused to commission him or assign him duties of an Army doctor. He had refused to answer questions concerning prior Communist Party affiliations. By the time the matter reached the Supreme Court, the Army had conceded that the plaintiff should be assigned to medical duties and had so assigned him. The issues before the Supreme Court were whether the Army was required under the Act to grant him a commission and whether the duties to which he was assigned—although practicing psychiatry, he was restricted from using certain drugs and from inducing hypnosis—fell within the scope of the statutory command.

The Court strongly suggested that the Army had been wise in finally assigning Orloff to medical duties, for there was power to review that claim and merit in it. The Court's language on the issue of Orloff's claim to a commission is by no means an unequivocal refusal to inter-

vene between the Army and one of its members. The oft quoted language denying jurisdiction relates to a very narrow issue—the duty of the Army under the statute to assign the plaintiff to particular duties within the broad category of medical duties. It was on this issue that the Court denied that it possessed corrective authority:

However, we are convinced that it is not within the power of this Court by habeas corpus to determine whether specific assignments to duty fall within the basic classification of petitioner. It is surely not necessary that one physician be permitted to cover the whole field within the medical classification, nor would we expect that a physician is exempt from occasional or incidental duties not strictly medical. In these there must be a wide latitude allowed to those in command.

We know that from top to bottom of the Army the complaint is often made, and sometimes with justification, that there is discrimination, favoritism or other objectionable handling of men. But judges are not given the task of running the Army. The responsibility for setting up channels through which such grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates. The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters. *Id.* at 93–94, 73 S.Ct. at 540.

Commentators have noted the narrow principle of nonreviewability which emerges from Orloff:

In sum, the centerpiece of the doctrine turns out to be something of a paper tiger. For all its unequivocal language in support of the nonreviewability principle, the decision itself is ambiguous * * *. *Willoughby* is authority for only a very circumscribed

rule of nonreviewability. *When it is clear that the military has not exceeded its statutory authority*—as by assigning an individual to an entirely improper general field—its exercise of discretion *within the purview of such authority*—as in the determination of particular duty assignments—is not reviewable. Note, God, The Army and Judicial Review: The In-Service Conscientious Objector, 56 Calif.L.Rev. 379, 429 (1968) (emphasis in original; footnotes omitted).

Developments since *Orloff* have demonstrated that there is no broad barrier to judicial review of military matters. Although the decisions are not uniform, the trend is toward limited exercise of power to control abuses by military as well as by civilian officials. A number of examples illustrate the trend.

First, the federal courts have greatly expanded their review of military courts-martial proceedings. In 1953 the Supreme Court recognized the propriety of a more expansive collateral review of courts-martial proceedings. *See* Burns v. Wilson, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953). The opinion was far from clear and the lower federal courts have widely diverged in their views of the permissible scope of their review of courts-martial proceedings. *Compare* Kennedy v. Commandant, United States Disc. Barracks, 377 F.2d 339 (10th Cir. 1967) and Swisher v. United States, 237 F.Supp. 921, 924–929 (W.D. Mo.1965), aff'd, 354 F.2d 472, 475 (8th Cir. 1966) *with* Kauffman v. Secretary of Air Force, 135 U.S.App.D.C. 1, 415 F. 2d 991, 996–997 (1969) and In Re Stapley, 246 F.Supp. 316, 321–322 (D.Utah 1965). *See* Sherman, Judicial Review of Military Determinations and the Exhaustion of Remedies Requirement, 55 Va.L.Rev. 483, 488–89 (1969); Note, Civilian Court Review of Court-Martial Adjudications, 69 Colum.L.Rev. 1259, 1262–1263 (1969); Note, Servicemen in Civilian Courts, 76 Yale L.J. 380, 385–88 (1966).

Recently, *Burns* has been read to allow review as broad as that given collateral review of state court proceedings. *See* Kauffman v. Secretary of Air Force, supra, 415 F.2d at 996–997; In Re Stapley, *supra*, 246 F.Supp. at 321; Note, Servicemen in Civilian Courts, 76 Yale L.J. 380, 392–96 (1966). A district court in Rhode Island has even permanently enjoined the convening of courts-martial proceedings to try a soldier for off-base possession of marijuana on the grounds that the military lacked jurisdiction to try the offense. Moylan v. Laird, 305 F.Supp. 551 (D.R.I.1969). *Contra* Levy v. Corcoran, 128 U.S.App.D.C. 388, 389 F.2d 929 (1967). *Cf.* O'Callahan v. Parker, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969).

Second, military administrative discharges are now subject to review in civil courts. This development began when the Supreme Court took jurisdiction in a mandamus proceeding to determine whether a less than honorable discharge issued to the petitioner was void because it was issued in excess of the Secretary of the Army's authority in that it was based on conduct before entry into military service. *See* Harmon v. Brucker, 355 U.S. 579, 582, 78 S.Ct. 433, 435, 2 L.Ed.2d 503 (1958). Since the Supreme Court's per curiam decision in *Harmon,* the lower federal courts have reviewed administrative discharge decisions in cases with varying factual situations. *See, e. g.,* Davis v. Stahr, 110 U.S.App.D.C. 383, 293 F.2d 860 (1961); Bland v. Connally, 110 U.S.App.D.C. 375, 293 F.2d 852 (1961); Jones, Jurisdiction of the Federal Courts to Review the Character of Military Administrative Discharges, 57 Colum.L.Rev. 917 (1957); Sherman, Judicial Review of Military Determinations and the Exhaustions of Remedies Requirement, 55 Va.L.Rev. 483, 490–96 (1969); Note, Dissenting Servicemen and The First Amendment, 58 Geo.L.J. 534, 562–66 (1970); Comment, God, The Army and the Judicial Review: The In-Service Conscientious Objector, 56 Calif.L.Rev. 379, 431–36 (1968). And they have reviewed discharges based on improperly conducted courts-martial. *See* Ashe v. McNamara,

355 F.2d 277 (1st Cir. 1965); Owings v. Secretary of United States Air Force, 298 F.Supp. 849 (D.D.C.1969).

The principle of *Harmon* has been extended to acts contemporaneous with service which were not a part of the military service record. Kennedy v. Secretary of the Navy, 131 U.S.App.D.C. 39, 401 F.2d 990 (1968); Stapp v. Resor, 314 F.Supp. 475 (S.D.N.Y.1970).

Federal courts have also reviewed complaints by individuals not yet separated from the service involving substantial interference with the day-to-day activities of the military. *See* Schwartz v. Covington, 341 F.2d 537 (9th Cir. 1965) (stay of separation of alleged homosexual); Ogden v. Zuckert, 111 U. S.App.D.C. 398, 298 F.2d 312 (1961).

In an area more clearly analogous to the situation before this Court, the federal courts are actively engaged in the review of the Army's treatment of applications for discharge as a conscientious objector. *See* United States ex rel. Donham v. Resor, 436 F.2d 751 (2d Cir. 1971); Hammond v. Lenfest, 398 F.2d 705, 710 (2d Cir. 1968); United States ex rel. Sheldon v. O'Malley, 420 F.2d 1344, 1348 (D.C. Cir. 1969); In Re Kanewske, 260 F.Supp. 521 (N.D.Calif. 1966), appeal dismissed as moot sub nom. Kanewske v. Nitze, 383 F.2d 388, 389 (9th Cir. 1967).

In a leading opinion, the Second Circuit has ruled that the federal courts must intervene to review claims of improper denial of discharge in in-service conscientious objector cases. Hammond v. Lenfest, 398 F.2d 705, 715–716 (2d Cir. 1968).

■ Broad review has certainly not been universally accepted as the standard in these cases. *See, e. g.*, Brown v. McNamara, 263 F.Supp. 686 (D.N.J.), aff'd, 387 F.2d 150 (3d Cir. 1967), cert. denied, 390 U.S. 1005, 88 S.Ct. 1244, 20 L.Ed.2d 105 (1968); Noyd v. McNamara, 267 F.Supp. 701 (D.Colo.), aff'd, 378 F.2d 538 (10th Cir.), cert. denied, 389 U.S. 1022, 88 S.Ct. 593, 19 L.Ed.2d 667 (1967). *See also* Note, God, The Army

and Judicial Review: The In-Service Conscientious Objector, 56 Calif.L.Rev. 379, 385–95 (1968); Note, Dissenting Servicemen and the First Amendment, 58 Geo.L.J. 534, 563–64 (1970). It is undoubtedly true that the civilian courts are—and should be—wary of interfering with military decisions regarding duty assignments and transfer orders. *Cf.* Bridges v. Davis, 311 F.Supp. 935, 938 (D.Hawaii 1969); Sherman, Judicial Review of Military Determinations and the Exhaustion of Remedies Requirements, 55 Va.L.Rev. 483, 493 (1969).

■ Courts do balance the perceived amount of interference with military matters against the nature and strength of the complainant's case in deciding whether to intervene. For example, in United States ex rel. Schonbrun v. Commanding Officer, 403 F.2d 371 (2d Cir. 1968), cert. denied, 394 U.S. 929, 89 S.Ct. 1195, 22 L.Ed.2d 460 (1969), where the petitioner was seeking habeas corpus in order to be relieved of the need to report for active duty with the rest of his reserve unit, jurisdiction was denied. The petitioner claimed an abuse of discretion; there was no allegation that the Army had failed to follow due process or had denied him any constitutional rights. In ruling the Court stated:

Although Schonbrun's case is appealing * * * the courts must have regard to the flood of unmeritorious applications that might be loosed by such interference with the military's exercise of discretion and the effect of the delays caused by these in the efficient administration of personnel who have voluntarily become part of the armed forces. We conclude that this is a subject on which civil review of discretionary action by the military should be declined—and this irrespective of the rubric under which the action is brought. While the Army's alleged violation of its own regulations, in failing to give notice of denial of his initial request and the reasons for it, might stand differently, Schonbrun was not prejudiced thereby. *Id.* at 375 (footnote omitted).

*See also* Arnheiter v. Chafee, 435 F.2d 691 (9th Cir. 1970); McAbee v. Martinez, 291 F.Supp. 77 (D.Md.), application for injunctive relief denied, 393 U.S. 904, 89 S.Ct. 226, 21 L.Ed.2d 195 (1968) (claimed insufficient training); Bridges v. Davis, 311 F.Supp. 935 (D.Hawaii 1969) (claimed denial of freedom to consult with minister of choice; court relied heavily on "theatre of war" rationale). *But cf.* Nixon v. Secretary of the Navy, 422 F.2d 934, 939 (2d Cir. 1970).

In contrast—where a First Amendment right was involved—the district court in Dash v. Commanding General, Fort Jackson, South Carolina, 307 F. Supp. 849 (D.S.C.1969), aff'd per curiam 429 F.2d 427 (4th Cir. 1970), reviewed the matter before it on its merits. The plaintiffs, noncommissioned servicemen, sought a declaration from the Court regarding their rights to distribute published materials on post and to hold a meeting on post to discuss the Vietnam War. The court considered the substantial First Amendment claims of the plaintiffs while recognizing that "it is not the function of courts to 'regulate the Army'" and "'judges are not given the task of running the Army.'" *Id.* at 853. *See also* Kiiskila v. Nichols, 433 F. 2d 745 (7th Cir. 1970) (en banc) (freedom of speech and association); Locks v. Laird, 300 F.Supp. 915 (N.D.Calif. 1969) (freedom of speech; wearing uniform at meeting); Yahr v. Resor, 431 F.2d 690 (4th Cir. 1970) (freedom of speech); In Re Brown v. Brown, 3 S.S. L.R. 3404 (E.D.Mich., Sept. 30, 1970) (freedom of speech). *Cf.* Wolff v. Selective Serv. Local Bd. No. 16, 372 F.2d 817, 824–826 (2d Cir. 1967). *But cf.* Locks v. Commanding General, Sixth Army, Case No. 50101 (N.D.Calif., Oct. 9, 1968).

Significant alterations in the size of the Armed Forces and the relationship of the Armed Forces to the society at large has made it necessary for the civilian judiciary to exercise this new role. As Former Chief Justice Warren has noted:

These events can be expressed very simply in numerical terms. A few months after Washington's first inauguration, our army numbered a mere 672 of the 840 authorized by Congress. Today, in dramatic contrast, the situation is this: Our armed forces number two and a half million; every resident male is a potential member of the peacetime armed forces; such service may occupy a minimum of four per cent of the adult life of the average American male reaching draft age; reserve obligations extend over ten per cent of such a person's life; and veterans are numbered in excess of twenty-two and a half million. When the authority of the military has such a sweeping capacity for affecting the lives of our citizenry, the wisdom of treating the military establishment as an enclave beyond the reach of the civilian courts almost inevitably is drawn into question. Warren, The Bill of Rights and the Military, 37 N.Y. U.L.Rev. 181, 187–88 (1962) (footnotes omitted).

Civilian courts may not shirk their duty to balance the needs of the military against the requirements of the Constitution in a democratic society. O'Callahan v. Parker, 395 U.S. 258, 265, 89 S.Ct. 1683, 1687, 23 L.Ed.2d 291 (1969).

In the case before us there are allegations and proof that the Army has acted through administrative transfers and changes in duty assignments to punish the plaintiffs and others for the exercise of First Amendment Rights. Under the circumstances this Court must take jurisdiction to review the merits of these claims.

## SCOPE OF REVIEW

This action does not come before this Court *de novo*. The particular grievances in issue have been examined in a proceeding under Article 138 of the Uniform Code of Military Justice, 10 U.S.C. § 938, and found to be without merit. Furthermore, General Seaman of the

First Army and the Secretary of the Army have reviewed and sustained the findings of the investigating officer. We must determine how much significance to afford these findings.

██ Generally, the review by a court of an administrative decision is limited to the adjudication of questions of law and the determination of whether findings of fact are supported by substantial evidence. *Cf.* Seaboard Airline R. Co. v. United States, 382 U.S. 154, 157, 86 S.Ct. 277, 278, 15 L.Ed.2d 223 (1965); Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 487–490, 71 S.Ct. 456, 465–466, 95 L.Ed. 456 (1951); Kiiskila v. Nichols, 433 F.2d 745, 750 (7th Cir. 1970) (en banc); Sanford v. United States, 399 F.2d 693 (9th Cir. 1968); Stephens v. United States, 358 F.2d 951, 954, 174 Ct.Cl. 365 (1966); Jenkins v. Commandant, First Naval District, 303 F.Supp. 1150 (D.Mass.1969); 4 Davis, Administrative Law Treatise § 2901 (1958). A limited review is justified when there has been one full adjudication of the issues. The assumption of the courts in applying such a limited standard of review is that there has been a fair hearing.

██ In this case there are serious doubts about the fairness of the administrative procedures utilized. The nature of the proceedings provides little basis for confidence in the conclusion that was reached. We need not decide what measure of due process the Army is bound to afford the plaintiff in the Article 138 Proceeding. This Court cannot, however, be bound to a narrow review of administrative proceedings when minimal standards of fairness are not observed, especially when the proceedings involve an important constitutional right. *Cf.* I. C. C. v. Louisville & N. R. Co., 227 U.S. 88, 91–92, 33 S.Ct. 185, 186–187, 57 L.Ed. 431 (1913).

At the very least due process requires notice of the rule of general applicability that is claimed to be violated. Farrell v. Joel, 437 F.2d 160, 163 (2d Cir. 1971). *Cf.* Briscoe v. Kusper, 435 F.2d 1046,

1054–1055 (7th Cir. 1970) (due process commands that state regulation of nominating procedures clearly specify requirements); K. Davis, Discretionary Justice 216 (1969). Here there was no regulation against plaintiffs' activities. The threats of Flores, the officer in charge of the Band, could not take the place of a rule. And, in any case, Flores' statements were admitted to be unauthorized and he was disciplined for making them.

Due process generally requires an effective hearing. *See* Goldberg v. Kelly, 397 U.S. 254, 269, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970). The plaintiffs' opportunity to be heard was minimal at best. Cortright never appeared before the investigating officer, and his letter from Fort Bliss in support of his allegations was not a part of the record when the original findings and conclusion were made. No opportunity was given any of the plaintiffs to confront and cross-examine witnesses or even to see a summary of what they said. *Compare* Goldberg v. Kelly, *id.* at 269, 90 S.Ct. at 1021 (1970); Willner v. Committee on Character and Fitness, 373 U.S. 96, 103–105, 83 S.Ct. 1175, 1180–1181, 10 L.Ed.2d 224 (1963); Greene v. McElroy, 360 U.S. 474, 496–497, 79 S.Ct. 1400, 1413, 3 L.Ed. 2d 1377 (1959); I. C. C. v. Louisville & N. R. Co., 227 U.S. 88, 93–94, 33 S.Ct. 185, 187–188, 57 L.Ed. 431 (1913). Members of the Band who instituted the grievance proceeding were not allowed to obtain civilian counsel or discuss their participation in the Article 138 Proceeding with their already retained counsel. *Compare* Goldberg v. Kelly, 397 U.S. 254, 270, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287 (1970); Powell v. Alabama, 287 U.S. 45, 88–89, 53 S.Ct. 55, 77 L.Ed. 158 (1932).

Defendants' reliance on the Supreme Court's decision in Cafeteria and Restaurant Workers Union, Local 473 v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L. Ed.2d 1230 (1961) is misplaced. There the Court held that summary denial of a security clearance by the commander of a military installation to an employee of a private contractor did not deny due

process although no specific reason for the denial was given and no hearing held. No security issue is raised in the instant case. Kiiskila v. Nichols, 433 F.2d 745, 750–751 (7th Cir. 1970) (en banc).

We are not deciding what constitutes due process in an Article 138 Proceeding. All this Court now holds is that if a 138 Proceeding is relied upon to limit this Court's power to review, at least minimal due process standards must be met. For purposes of limiting scope of review a totally inadequate hearing is equivalent to no hearing.

 Our decision in this matter need not, however, rest on the fact that the plaintiff was denied due process in the Article 138 Proceeding. Based on the whole record compiled by the investigating officer, there is no substantial evidence to support his findings and conclusions. Although additional evidence was received by the Court, it was merely cumulative and was not necessary to the determination of this controversy.

Since there was lack of procedural due process and since the Army's administrative review failed to meet the substantial evidence standard, as far as the question of free speech is concerned, the conclusions reached in the Article 138 Proceeding were, in a legal sense, arbitrary and capricious.

## APPLICABILITY OF THE FIRST AMENDMENT TO MEMBERS OF THE ARMED FORCES

The right of a member of the Armed Forces to the protection of the Bill of Rights, and more specifically the right of freedom of speech, has been the subject of much controversy. *Compare* Wiener, Courts-Martial and the Bill of Rights: The Original Practice, 72 Harv. L.Rev. 266, 267–271 (1958) *with* Henderson, Courts-Martial and the Constitution: The Original Understanding, 71 Harv.L.Rev. 293, 315 (1957). Until recent times the Bill of Rights had little relevance to servicemen. Note, Servicemen in Civilian Courts, 76 Yale L.J. 380,

382–84 (1966); Note, Constitutional Rights of Servicemen Before Courts-Martial, 64 Colum.L.Rev. 127, 133 (1964). This result stemmed largely from the failure of the civilian courts to involve themselves in military jurisprudence in any meaningful way and from the decentralized and ad hoc nature of the early military judicial system. Substantive rights remain undefined until procedures for vindication are available.

With the enactment of the Uniform Code of Military Justice and the establishment of the Court of Military Appeals the position of the military courts has developed to the point where "the protections in the Bill of Rights, except those which are expressly or by necessary implication inapplicable, are available to members of our armed forces." United States v. Jacoby, 11 USCMA 428, 430–31, 29 CMR 244, 246–47 (1969). *See* United States v. Tempia, 16 USCMA 629, 633–34, 37 CMR 249, 253–54 (1967). The Court of Military Appeals has held that servicemen have the Sixth Amendment right to confront the witnesses against them (United States v. Jacoby, 11 USCMA 428, 29 CMR 244 (1960)) and the Fifth Amendment right to refuse to incriminate themselves, with the attendant "Miranda" safeguards (United States v. Tempia, 16 USCMA 629, 37 CMR 249 (1967)). Most important, the Court of Military Appeals has recognized that members of the Armed Forces have the right to freedom of speech although it must be reconciled with the needs of the military. *See* United States v. Howe, 17 USCMA 165, 176–77, 37 CMR 429, 440–41 (1967); United States v. Vorhees, 4 USCMA 509, 521, 16 CMR 83, 95 (1954); *see also* United States v. Bayes, 22 CMR 487, 489–91 (1956), petition for grant of review denied, 7 USCMA 798, 23 CMR 421 (1957); Note, Constitutional Rights of Servicemen Before Courts-Martial, 64 Colum.L.Rev. 127, 133–41 (1964).

The Army itself recognizes that First Amendment rights are not abandoned by membership in the Armed Forces. In its "Guidance On Dissent", ·dated June 23,

1969 and widely disseminated through all commands, it acknowledged the right to dissent, informing all soldiers that:

> The right to express opinions on matters of public and personal concern is secured to soldier and civilian alike by the Constitution and Laws of the United States. This right, however, is not absolute for either soldier or civilian. Other functions and interests of the Government and the public, which are also sanctioned and protected by the Constitution, and are also important to a free, democratic and lawful society, may require reasonable limitations on the exercise of the right of expression in certain circumstances. In particular, the interest of the Government and the public in the maintenance of an effective and disciplined Army for the purpose of National defense justifies certain restraints upon the activities of military personnel which need not be imposed on similar activities by civilians.

> * * * The following general guidelines are provided to cover some of the manifestations of dissent which the Army has encountered.

> \* \* \* \* \* \*

> A commander may not prevent distribution of a publication simply because he does not like its contents. * * * A commander must have cogent reasons, with supporting evidence, for any denial of distribution privileges. The fact that a publication is critical—even unfairly critical—of government policies or officials is not in itself, a grounds for denial.

> \* \* \* \* \* \*

> The right of members to complain and request redress of grievances against actions of their superiors is protected by the Inspector General system (AR 20–1) and Article 138, UCMJ. In addition, a soldier may petition or present any grievance to any member of Congress (10 U.S.C. Sec. 1034). * * * Complaining personnel must not be treated as "enemies of the system." * * *

Department of Defense Directive Number 1344.10 dated September 23, 1969 provides, as one of the "Examples of Types of Political Activity Permitted," that a member of the military may perform the following action:

> Write a letter to the editor of a newspaper expressing the member's personal views concerning public issues, provided those views do not attempt to promote a partisan political cause.

Freedom of speech is not necessarily inimical to the purposes of the military. As one commentator asked and answered:

> Does, then, a member of the Armed Forces have the right to criticize or even disparage before a public gathering our foreign and domestic policies? Does a soldier have a right to carry a placard or banner and join in demonstrations against our conduct of a war? Can he, under the protective mantle of the first amendment, publish whatever he pleases? It depends. It depends upon many factors just as it would in the case of his civilian brethren. What appears certain, however, is that those considerations that support any program of enforced silence must be demonstrated to the satisfaction of the courts to overbalance the established right of the soldier-citizen to freedom of expression.

> \* \* \* \* \* \*

> The application of these tests compelled by the interpretation of the Constitution by the Supreme Court and the Court of Military Appeals will spell the doom of neither discipline and order nor the unfettered freedom of men and women in uniform. Just as the flexibility of these tests permits the reconciliation of individual freedom with the needs of civilian society, so also it affords a similar reconciliation of the respective needs of the military service and the soldier.

Lewis, Freedom of Speech—An examination of the Civilian Test for Constitutionality and its Application to the Military, 41 Mil.L.Rev. 55, 79–80 (1968).

*See also* Brown, Must the Soldier Be a Silent Member of Our Society?, 43 Mil. L.Rev. 71, 109 (1969).

Along with the beginning of civilian court review of military matters and the development of servicemen's constitutional rights in military courts, civil courts have recognized the fundamental constitutional rights of military men. For example, in reviewing courts-martial and administrative discharges, civilian courts have held that the military must observe due process. *See, e. g.*, Burns v. Wilson, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953); Kauffman v. Secretary of Air Force, 135 U.S.App.D.C. 1, 415 F.2d 991, 996–997 (1969). What is more to the point, as we have already noted, in an increasing number of instances the federal courts have determined that the right of freedom of speech is applicable to servicemen. *See, e. g.*, Yahr v. Resor, 431 F.2d 690, 692 (4th Cir. 1970); Locks v. Laird, 300 F.Supp. 915, 918–920 (N.D.Calif.1969) and other cases cited *supra* at 55–56. Boyce, Freedom of Speech and the Military, 1968 Utah L.Rev. 240, 253–56 (1968); Kester, Soldiers Who Insult the President: An Uneasy Look at Article 88 of the Uniform Code of Military Justice, 81 Harv.L.Rev. 1697, 1740–43 (1968); Note, Dissenting Servicemen and the First Amendment, 58 Geo.L.J. 535, 539 (1970).

It is strange to suggest that those who are asked to fight, perhaps to die, to preserve our basic freedoms should be denied those freedoms. Members of the Armed Forces may vote. It is hard to see how they can do so intelligently unless they are free to express their views and to refine them in the give and take of discussion.

Defendants suggest that the need for discipline is the crucial reason for the inapplicability of the freedoms of the Bill of Rights to the military. They rely heavily on the language from the Second Circuit's opinion in Raderman v. Kaine, 411 F.2d 1102, 1104 (2d Cir. 1969):

If he asks: Does being in the Army curtail or suspend certain Constitutional rights?, the answer is unqualifiedly "yes". Of necessity, he is forced to surrender many important rights. He arises unwillingly at an unreasonable hour at the sound of a bugle unreasonably loud. From that moment on, his freedom of choice and will ceases to exist. He acts at the command of some person—not a representative of his own choice—who gives commands to him which he does not like to obey. He is assigned to a squad and forced to associate with companions not of his selection and frequently the chores which he may be ordered to perform are of a most menial nature. Yet the armed services, their officers and their manner of discipline do serve an essential function in safeguarding the country. The need for discipline, with the attendant impairment of certain rights, is an important factor in fully discharging that duty.

Neither the argument of the defendants nor the language of *Raderman* requires that servicemen be deprived of such basic constitutional rights as freedom of speech. The importance of discipline in the Army is most certainly a significant factor to be taken into account when defining the limits of restraints on speech. The individual must be more closely regimented in the military than in civilian life. Discipline, as well as the Army's close connection with the national security, may well justify stricter control on speech activities of servicemen, but these needs cannot provide the basis for an effective denial of freedom of speech based upon objection to the ideas expressed. *See* Yahr v. Resor, 431 F.2d 690 (4th Cir. 1970); In Re Brown v. Brown, 3 S.S.L.R. 3404 (E.D.Mich. 1970); Dash v. Commanding General, 307 F.Supp. 849, 853 (D.S.C.1969), aff'd per curiam, 429 F.2d 427 (4th Cir. 1970); Brown, Must the Soldier Be a Silent Member of Our Society?, 43 Mil.L.Rev. 71 (1969); Note, Dissenting Serviceman And the First Amendment, 58 Geo.L.J. 534, 535–44 (1970); Note, Servicemen in Civilian Courts, 76 Yale L.J. 380, 396–402 (1966).

The right of soldiers to speak may not be absolute. It may be necessary to balance it against the interests of the military in preserving discipline and protecting the national security. *See* Dash v. Commanding General, 307 F.Supp. 849, 852–53 (D.S.C.1969); Brown, Must the Soldier Be a Silent Member of Our Society?, 43 Mil.L.Rev. 71, 81–82 (1969); Warren, The Bill of Rights and the Military, 37 N.Y.U.L.Rev. 181, 182 (1962); Note, Dissenting Servicemen and the First Amendment, 58 Geo.L.J. 534, 536–37 (1970); Note, Servicemen in Civilian Courts, 76 Yale L.J. 380, 402 (1966). But, when measuring the balance this Court must be mindful of the great weight to be given to the value of the free exchange of ideas. Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); Rainey v. Jackson State College, 435 F.2d 1031 (5th Cir., 1970); Albaum v. Carey, 283 F.Supp. 3, 9–13 (E.D.N.Y.1968). *See also* Lewis, Freedom of Speech—An Examination of the Civilian Test for Constitutionality and its Application to the Military, 41 Mil.L.Rev. 55, 79 (1968). This "profound commitment to the principle that debate on public issues be uninhibited, robust and wide-open," (New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964)), includes the right to criticize and verbally attack our government and public officials about such matters as our stance in Southeast Asia. *See* Kiiskila v. Nichols, 433 F.2d 745, 748 (7th Cir. 1970) (en banc).

As part of the protection for the right of freedom of speech, it is now firmly established that the use or threatened use of otherwise perfectly legal means for the purpose of intimidating and of inhibiting free speech is illegal. *Cf.* Bond v. Floyd, 385 U.S. 116, 135–136, 87 S.Ct. 339, 349, 17 L.Ed.2d 235 (1966); Dombrowski v. Pfister, 380 U.S. 479, 490, 85 S.Ct. 1116, 1123, 14 L.Ed.2d 22 (1965); Cameron v. Johnson, 381 U.S. 741, 85 S.Ct. 1751, 14 L.Ed.2d 715 (1965); Konigsberg v. State Bar of Calif., 353 U.S. 252, 273, 77 S.Ct. 722, 733, 1 L.Ed.2d 810 (1957); Wolff v. Selective Serv. Loc. Bd. No. 16, 372 F.2d 817, 824 (2d Cir. 1967).

## DENIAL OF FREE SPEECH TO PLAINTIFFS

Several possibly knotty problems in the free speech area have been eliminated from this case by the almost indisputable facts. First, since a petition is one of the purest forms of speech in a First Amendment sense, this is not a case involving the difficult task of drawing lines between acts and speech. *Cf.* Tinker v. Des Moines Ind. Community School Dist., 393 U.S. 503, 505–508, 89 S.Ct. 733, 736–737, 21 L.Ed.2d 731 (1969); United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678–1679, 20 L.Ed.2d 672 (1968); Henkin, Foreword: On Drawing Lines, 82 Harv.L.Rev. 63, 76–82 (1968). We are faced with the punishment of those verbally communicating ideas solely because of the political content of those ideas.

The only instance where significant non-verbal conduct was involved was the off-post demonstration of five women on July 4, 1970. Neither the Article 138 Proceeding nor the trial revealed that they were acting otherwise than on their own behalf. *Cf.* Kiiskila v. Nichols, 433 F.2d 745 (7th Cir. 1970) (en banc) (right of civilian anti-war proponent to come on to post). Nor was there any evidence that anyone in the Band acknowledged their presence or participated in any way in their activity. Holding men responsible for the activities of wives or of sweethearts, without proof of any other connection, is hardly consonant with due process. The only activities the members of the Band participated in, and which were found objectionable by their superiors, were the circulation and signing of the petitions.

Second, on the facts in this case, the Army's interest in protecting national security is of little consequence. Restrictions on speech were not based upon any

person's special access to information. The content of the speech in this case had nothing to do with classified or secret military matters. On the contrary, it involved a matter which has been the subject of widespread public debate. *See* United States v. Vorhees, 4 USCMA 509, 16 CMR 83 (1954). Nor is this a situation involving the delicate relationship between the civilian heads of government and military commanders. *See* Boyce, Freedom of Speech and the Military, 1968 Utah L.Rev. 240, 255; Vagts, Free Speech in the Armed Forces, 57 Colum.L.Rev. 187, 203–10 (1957).

Third, the investigating officer uncovered no criticism or disrespect for superiors either civilian or military. *See* United States v. Howe, 17 USCMA 165, 37 CMR 429 (1967). *But see* Kester, Soldiers Who Insult the President: An Uneasy Look at Article 88 of the Uniform Code of Military Justice, 81 Harv.L.Rev. 1697 (1968). Nor was dissension greater than can be expected whenever there are strongly held views about important matters. *Cf.* Pickering v. Board of Educ., 391 U.S. 563, 568–570, 88 S.Ct. 1731, 1734–1736, 20 L.Ed.2d 811 (1968).

Finally, the speech activities at issue involved public appeals to join the members of the Band in petitioning our government on a vital public matter. The plea was made in a style well accepted by American tradition. This was no call to rebellion or riot; it was not a call to civil disobedience of any kind. If these men had not been soldiers, their right to carry on these activities would be unquestioned.

■ The facts, both as elicited from the record of the Article 138 Proceeding and as developed at the trial, demonstrate that the changes in duty assignments of the Band as a whole were for the purpose of halting the public expressions of disagreement with the Vietnam War by Band members. The conclusion of the investigating officer in his report of the Article 138 Proceeding that the changes in duty assignments were made for the purpose of improving the military efficiency of the Band, is simply not supported by the record. The statements made by Flores at the time the changes were announced were intended to, and had the effect of, making it clear that public expression of opposition to the Vietnam War had brought on these changes and that any further like activities would cause the removal of further privileges. Before July 8, 1970 neither Flores nor his superiors were dissatisfied with the military efficiency of the Band except as the exercise of free speech and military efficiency were equated. In his explanation on July 13, 1970, Colonel Merrick admitted that Flores had presented the changes as punishment for the Band's free speech activities. His reinterpretation of the reasons for instituting the changes had no practical impact.

■ On the record in the Article 138 Proceeding there was no substantial evidence to support the findings and conclusion reached by the investigating officers and accepted by General Seaman and the Secretary of the Army. On the contrary, the record establishes that the changes in duty assignments of the Band were for the purpose of halting speech. The threat of such action had already been successful. A majority of the Band had signed the second petition by the time Flores intervened. His threats and the fear of reprisal caused their names to be withdrawn.

The Army does not deny that Cortright's transfer was effected in order to halt his leadership of the anti-war activities of the Band. The conclusion of the Article 138 Proceeding was, however, that Cortright's activities went beyond permissible bounds in that some part of the circulation of the petition and discussion of the petition took place on post while he was "on duty." Without a demonstration that this speaking clearly endangered some significant interest of the Army, no sufficient reason for suppression is made out. Pickering v. Board of Educ., 391 U.S. 563, 569–570, 88 S.Ct. 1731, 1735–1736, 20 L.Ed.2d 811 (1968);

Kiiskila v. Nichols, 433 F.2d 745, 750 (7th Cir. 1970) (en banc). Although there were guidelines for the exercise of speech by soldiers in effect at the time of Cortright's activities, the Army can point to no specific regulation violated by plaintiff's minimal on-post activity. *See* General Release, Office of the Adjutant General, Department of the Army, dated May 28, 1969, Subject: Guidance on Dissent; Fort Hamilton Regulation No. 210–9, dated May 12, 1969. *Cf.* Fort Hamilton Regulation No. 210–9, dated October 8, 1970.

Much of the on-post activity was instigated by those who opposed the petition, including Flores. Moreover, on-post discussions did not interfere with the required duty of Cortright or any other member of the Band. It is highly doubtful that such conversation can be barred merely because it is carried on at a military installation, especially when presence at the installation is required. *Cf.* Amalgamated Food Emp. U. Loc. 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 315–320, 88 S.Ct. 1601, 1606–1609, 20 L. Ed.2d 603 (1968); Thornhill v. Alabama, 310 U.S. 88, 98–100, 105–106, 60 S.Ct. 736, 742–743, 746, 84 L.Ed. 1093 (1940).

■ Defendants argue that even if plaintiff's activities were permissible, suppression and transfer were legal because they were hampering the public relations missions of the Band. When reduced to its essence, the contention is that the publicity which accompanied the speech activities associated with the Band might have proved offensive to some organizations or individuals. Freedom of speech cannot be curtailed merely because some are offended by what is said. *See* Bachellar v. Maryland, 397 U. S. 564, 567, 90 S.Ct. 1312, 1316, 25 L.Ed. 2d 570 (1970); Street v. New York, 394 U.S. 576, 588, 592, 89 S.Ct. 1354, 1365, 22 L.Ed.2d 572 (1969); Gregory v. Chicago, 394 U.S. 111, 119, 89 S.Ct. 946, 951, 22 L.Ed.2d 134 (1969) (Black, J., concurring); Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Cox v. Louisiana, 379 U.S.

536, 551, 85 S.Ct. 453, 462, 13 L.Ed.2d 471 (1965); Blasi, Prior Restraints on Demonstrations, 68 Mich.L.Rev. 1481, 1510–15 (1970). *See also* Watson v. Memphis, 373 U.S. 526, 535, 83 S.Ct. 1314, 1320, 10 L.Ed.2d 529 (1963). *But see* Feiner v. New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 267 (1951).

None of the suggestions in Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) relating to the possibility that criticism of his employer's policy might "undermine the effectiveness" of an employee bear on the case before us. There was, for example, no intimate working relationship between plaintiffs and the officers of the First Army requiring a consensus of view on the desirability of continuing the war in Vietnam. *Id.* at 570–571, n. 3, 88 S.Ct. 1731. *See also* Kiiskila v. Nichols, 433 F.2d 745, 750 (7th Cir. 1970) (en banc). Plaintiffs' views had no effect on the way they marched or played. *Cf.* Lefcourt v. Legal Aid Society, S.D.N.Y., 312 F.Supp. 1105, 1112–1113 (S.D.N.Y.1970). So far as the Army as a whole is concerned, it should have no views on the political questions involved in our policy respecting Southeast Asia; its duty is to carry out civilian policy. Plaintiffs' speech was in the exercise of rights as civilians respecting civilian policy.

At the trial General Ciccolella stated that he ordered the transfer of Cortright because he did not believe that the Band, in its present state, was capable of performing its function of taking up arms and defending the country, if it were called upon to do so. Arguably tighter restriction on speech by members of the Armed Forces may be applied in wartime or near battlefronts during peacetime. *Cf.* Ex Parte Milligan, 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (1866); Bridges v. Davis, 311 F.Supp. 935, 940 (D.Hawaii 1970); Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943); Warren, The Bill of Rights and the Military, 37 N.Y.U.L.Rev. 181, 191–195 (1962). But neither situation exists here. If we are at war it is a war for limited purposes

only and not one declared explicitly by Congress. *See Orlando v. Laird,* 317 F. Supp. 1013, 1017–1019 (E.D.N.Y.1970); *Berk v. Laird,* 317 F.Supp. 715, 721–728 (E.D.N.Y.1970); Comment, 5 Geo.L.Rev. 181 (1970). The members of this Band are far removed from the battle zone, and there was no showing that they were likely to be called immediately into combat. A remote contingency is not enough to legitimate the suppression of speech.

■ In sum, the plaintiffs' activities were discreet and well within the boundary of permissibility even when viewed in the military context. Plaintiffs' activities created no imminent threat to an interest of the Army that could possibly outweigh their interest in freedom of speech.

### FAILURE TO FOLLOW ARMY REGULATIONS

■ This Court has jurisdiction to review allegations that the military has failed to follow its own regulations in making transfers. *See Harmon v. Brucker,* 355 U.S. 579, 581–582, 78 S.Ct. 433, 435, 2 L.Ed.2d 503 (1956); *United States ex rel. Donham v. Resor,* 436 F.2d 751, 754 (2d Cir. 1971); *Feliciano v. Laird,* 426 F.2d 424, 427 (2d Cir. 1970); *Nixon v. Secretary of the Navy,* 422 F.2d 934, 937 (2d Cir. 1970); *Hammond v. Lenfest,* 398 F.2d 705, 715–716 (2d Cir. 1968); *Smith v. Resor,* 406 F.2d 141, 145 (2d Cir. 1969); *Schatten v. United States,* 419 F.2d 187, 191 (6th Cir. 1969). Cortright alleges that his transfer to an overstrength unit was a violation of Army Regulations which prohibit nonessential transfers. The Court must examine this claim, made in the light of First Amendment violations.

■ Army Regulation 614–6 paragraph 4(a) authorizes the permanent transfer of military personnel on the basis of necessity only. It reads:

Department of the Army policy is that permanent change of station travel for all military personnel be authorized on a military *necessity* basis only and that all *non-essential* movements be eliminated. (Emphasis supplied.)

The facts of this case clearly show that Cortright's transfer was not essential to the needs of the 62nd Army Band at Fort Bliss, Texas. It was already overstrength in his specialty and another man was on the way who was also in his specialty. The transfer could not be essential to the 26th Army Band at Fort Wadsworth because Cortright's protected speech was the cause of what was conceived to be a discipline and efficiency problem in that Band. Such a reason for transfer is constitutionally impermissible. The transfer was not essential and violated Army Regulation 614–6 paragraph 4(a). *Cf. Feliciano v. Laird,* 426 F.2d 424 (2d Cir. 1970).

### LACK OF STANDARD

We have found no regulation regarding dissent or political activity—and none has been brought to our attention—violated by any members of the Band. The 1969 guidelines, "Guidance on Dissent," did not cover the matter explicitly and its general tenor could not overcome the effects of a grudging acknowledgment in the First Army of the right to express dissent on political issues. It was not until October 8, 1970 that circulation of petitions at a Fort Hamilton Complex Post was forbidden. *See* Memorandum dated 5 November 1970 from Chief of Staff, Subject "Demonstrations, Distribution of Publications and Other Activities." We express no view on the legality of such a prohibition.

Had the language of the dissent guidelines then in force been applied to forbid the plaintiffs' activities we would be faced with serious constitutional questions of vagueness and overbreadth. *Cf. United States v. Robel,* 389 U.S. 258, 265–266, 88 S.Ct. 419, 424–425, 19 L.Ed. 2d 508 (1967); *Aptheker v. Secretary of State,* 378 U.S. 500, 512–516, 84 S.Ct. 1659, 1667–1669, 12 L.Ed.2d 992 (1964); *N.A.A.C.P. v. Button,* 371 U.S. 415, 432–437, 83 S.Ct. 328, 337–340, 9 L.Ed.2d 405 (1963).

 Particularly in an organization as large as the Army it seems essential, where constitutional rights are involved, to guide the intermediate officer chain of command as well as soldiers. The tendency, particularly at the lower levels of command, to reduce problems by eliminating divergencies among men is well known and is clearly demonstrated by the facts in the case before us. No matter how sound the intentions of the Secretary of the Army in the area of free speech, the attenuation of good will towards the Constitution may become substantial before it reaches the soldier unless there are precise regulations controlling what can and cannot be done.

The exercise of free speech does increase the possibility of dissension. If limitations on its exercise are intended, more specific guidelines than were available to members of the Armed Forces are required. Vagts, Free Speech in the Armed Forces, 57 Colum.L.Rev. 187, 218 (1957). In the absence of regulations, the courts will, in effect, write them on a case by case basis. Yet case law seems a particularly inappropriate way of handling the matter because a great deal of litigation and ensuing uncertainty will prevail while the law is being ascertained and because court decisions are less likely to be understood and followed in the lower ranks than would forthright and clearly written Army regulations. Nevertheless, absent appropriate action by the Armed Forces themselves, the courts have no alternative but to add to their already overburdened calendars by providing protection for soldiers' rights of free speech. *Cf.* C. McGowan, The Organization of Judicial Power in the United States, 93–97 (1967); Rosenberg, Devising Procedures that are Civil to Promote Justice that is Civilized, 69 Mich.L.Rev. 797, 809–812 (1971). As matters stood when the events in question occurred, there was no regulation except the idiosyncratic views of individual superiors that suggested to plaintiffs that they were speaking out at the wrong time or in the wrong place or in the wrong way.

In drafting regulations, inhibitions based on content need to be viewed with particular care. It may even be that soldiers will need some training in the art of polite discourse and disagreement if our Armed Forces are not to be torn apart when men feel strongly about public issues.

There are, of course, very serious practical difficulties presented to the Armed Forces by the need to balance free speech mandates and the almost absolute discipline of soldiers required for the safety of the nation and soldiers themselves in time of battle. We recognize, for example, that much of our Army's success lies in the initiative afforded all levels of command which might be stultified by too much regulation and red tape. Nevertheless, suppression of the kind revealed in the case before us cannot be permitted under our Constitution.

## CONCLUSION ON FACTS AND LAW

This case reveals a lack of adequate regulations to protect the rights of soldiers to discuss, sign and publish petitions. This lack was compounded by a failure of the command structure—from the General, Chief of Staff of the First Army to the Band's CW3 Commanding Officer—to protect the constitutional rights of soldiers through the exercise of discretion. And, finally, the Article 138 Proceeding, instead of being used for "redressing the wrongs complained of," gave those wrongs administrative sanction and approval. The errors were due to a misunderstanding at every level of the importance of protecting First Amendment rights of soldiers. Plaintiffs are entitled to an appropriate remedy from the courts since they cannot get one from the Army.

## REMEDY

The question of the proper remedy in this situation is a troubling one. On the one hand, it is obvious that this Court should not use its equity power to involve itself deeply in the activities of the Army. On the other hand, a remedy

must be fashioned to set aright the wrong that has occurred.

 The plaintiffs have asked for a permanent injunction prohibiting the defendants, their agents or employees from interfering with the First Amendment rights of the plaintiffs. This request is too broad since such interference—both real and imagined—can take place in many ways and this Court has no desire to become involved in the day-to-day affairs of the 26th Army Band. It is enough to declare past acts improper, resting on the assumption that this incident, or one like it, will not be permitted to recur.

 Steps need to be taken, however, to insure that these past acts do not inhibit future proper speech. This Court has power to order such affirmative acts on the part of defendants. *Cf.* Griffin v. County School Bd., 377 U.S. 218, 232–233, 84 S.Ct. 1226, 1234, 12 L.Ed.2d 256 (1964); Gautreaux v. Chicago Housing Authority, 304 F.Supp. 736 (N.D.Ill. 1969); Developments in the Law—Injunctions, 78 Harv.L.Rev. 994, 1061–64 (1965).

It is ordered that representatives of the defendants post on bulletin boards utilized by the Band copies of the United States Army's current official guidelines regarding dissent. They shall also post a one page statement of the facts and conclusions in this litigation. *Cf.* Textile Workers U. of America, A.F.L.–C.I.O. v. N.L.R.B., 388 F.2d 896, 903–904 (2d Cir. 1967), cert. denied, J. P. Stevens & Co. v. N.L.R.B., 393 U.S. 836, 89 S.Ct. 112, 21 L.Ed.2d 107 (1968); Escabra v. New York City Housing Authority, 67 Civ. 4307 (S.D.N.Y., Jan. 19, 1971). Counsel will submit drafts of such a statement within ten days.

Specialist Cortright's transfer to the 62nd Army Band at Fort Bliss, Texas is ordered rescinded. He shall be returned to the 26th Army Band and reinstated to his former duties and position insofar as that is reasonably possible. He may not be transferred from the 26th Army Band for the proper exercise of his right to free speech, but he may be transferred for other reasons.

The complaints of the intervening plaintiffs are dismissed.